## IDA BLACKBURN v. THE CHEROKEE LUMBER COMPANY.

(Filed 20 April, 1910.)

1. **Railroads—Automatic Couplers—Negligence—To What Roads Applicable.**

   A corporation operating a short standard-guage railroad with steam motive power, well surveyed and constructed, over which a very large output of sawed lumber from a mill was exclusively hauled to its connecting railroad for further transportation, is responsible for an injury received by its employee in the course of his employment, caused by its negligently failing to furnish and equip its cars with automatic couplers.

2. **Same—Continuing Negligence—Contributory Negligence—Question for Jury.**

   When the injury complained of was received by reason of the parting of a freight car from the engine, which would not have occurred if the defendant railroad company had equipped its cars with automatic couplers, the plaintiff being an employee acting within the scope of his duties, at the time, the negligent failure of the defendant to so equip its cars continued up to the time of the injury, and bars the defense of contributory negligence, unless the negligence of the defendant amounted to recklessness; and the mere fact that the plaintiff was on the running-board of the engine at the time, and used an iron pin to make the coupling, furnished for the purpose by the defendant, raises a question of fact for the jury, under the circumstances, upon the question of such contributory negligence.

3. **Master and Servant—Servant's Discretionary Powers—Scope of Agency.**

   An engineer having full authority to hire or discharge his train crew is presumed as not acting beyond the sphere of his assigned duties in doing the work of a brakeman, when, dissatisfied with the manner in which the brakeman was doing his work, and having ordered him to fire the engine and ordered a competent man to run it, and when killed while acting as brakeman, by the negligence of the defendant in failing to equip its train with an automatic coupler, the relation of master and servant still existed, and the master is liable for the injury received by reason of its negligent act.

APPEAL from *O. H. Allen, J.,* at August Term, 1909, of SAMPSON.

The following issues were submitted to the jury:

1. Was plaintiff's intestate injured by the negligence of the defendant, as alleged? Answer: Yes.

2. If so, was the plaintiff's intestate guilty of contributory negligence, as alleged? Answer: No.

3. What damage, if any, is plaintiff entitled to recover? Answer: $725.

The evidence tended to show, and was accepted by the jury as sufficient to prove, that defendant company was operating a well-constructed railroad from its mill to a station named Garland on the Atlantic Coast Line Railroad; that its track was standard guage, well surveyed and constructed, and regularly and properly inspected and maintained; that its output of sawed lumber was very large and it was hauled over this track exclusively, and in cars of standard guage, furnished it by the Atlantic Coast Line Railroad Company; that the intestate was the engineer having in charge the trains operated on its road, with power to hire and discharge his train crew, brakemen and firemen. The length of this road was two miles. On the night of 30 November, 1907, the engineer, Blackburn, was run over and killed while going from the defendant's mill to Garland. This action was brought by his widow, as administratrix.

The circumstances of the alleged negligent killing were substantially as follows: At the mill, a certain amount of shifting of cars had to be done by the engine; Will Hassell was doing the switching and Lem Rich was firing for the engine. The intestate, for some reason, became impatient with the manner in which Hassell was doing his work, and ordered him to the engine to fire it; that intestate did the work of the switchman, and Rich, under his orders, acted as engineer; Rich had had some experience in running the engine, and seems to have performed his work well that night. The defendant did not use automatic couplers, but coupled its cars in the old way. One of the cars to be hauled by the engine that night was an A. C. L. box car, equipped with the automatic coupler, but it had to be coupled to the engine of the defendant by an iron pin; it was so coupled by intestate, he using the smaller of two pins on the engine, provided by the defendant for coupling. The engine was running backward, pulling the car. There was evidence that intestate tried to use the larger pin, but unsuccessfully; and there was evidence that he picked it up, but did not attempt to use it. After the train was ready to move, the intestate, having a lantern on his arm, stepped on the board running across in front of the engine, the usual place for the switchman; there being no hand-hold on the engine, he leaned back against the

box car and signaled the acting engineer to proceed. The train started and proceeded without accident until it reached an up-grade, when, in pulling it, the coupling-pin bent, the car separated from the engine, the intestate fell and was run over and killed. There was evidence that intestate's attention was called to his position of danger, but he replied he did not think he would get hurt. There was evidence that the intestate had been drinking, but this was contradicted; this was submitted by his Honor to the jury, to be considered by them in passing upon the conduct of the intestate. From the judgment entered upon the verdict, the defendant appealed.

*Faison & Wright* for plaintiff.
*George E. Butler* and *H. L. Stevens* for defendant.

MANNING, J. The exceptions taken by defendant and assigned as errors can be arranged and considered in three groups, to wit: 1. That the defendant was under the duty to furnish and equip its cars with automatic couplers, and its failure to do so was negligence. 2. That intestate was guilty of contributory negligence in voluntarily taking a position of peril, and in failing to use the larger of the two pins in coupling the car to the engine. 3. That having voluntarily undertaken to perform a service not within the scope of his employment, the relation of master and servant was temporarily suspended, and the defendant owed him no duty, except to abstain from willful injury.

This Court has ruled against the contentions of the defendant in its exceptions embraced in the first group, as above arranged. *Hairston v. Leather Co.,* 143 N. C., 512; *Bird v. Leather Co.,* 143 N. C., 283; *Hemphill v. Lumber Co.,* 141 N. C., 487; *Sawyer v. R. R.,* 145 N. C., 24; *Stewart v. Lumber Co.,* 146 N. C., 47; *Wright v. R. R.,* 151 N. C., 529.

We have examined the charge of his Honor covering the view contended for by defendant in the exceptions included in the second group, and we find that his Honor charged the jury in the language approved by this Court in *Elmore v. Railway,* 132 N. C., 865, and *Hairston v. Leather Co., supra,* and *Coley v. R. R.,* 129 N. C., 407. We cannot say, as a matter of law, upon the evidence presented in the record, that "the apparent danger was so great that its assumption amounted to reckless indifference to probable consequences," or that the intestate "acted foolishly and without prudence," and that his conduct amounted to recklessness. If the defendant had furnished and equipped its train with automatic couplers there would have been, on the

night in question, no separation of the train and no accident to the intestate. "The proximate cause of the injury was the breaking of the defective coupling-pin, and the consequent parting of the cars. The negligence of the injured brakeman, in being in an improper place, if it can be called negligence, was a mere condition of the injury. The breaking of the defective pin was the proximate cause of the injury. His being on the cars was not the immediate cause of it in a juridical sense." *Terre Haute and I. R. Co. v. Mansberger,* 65 Fed., 196; *Phillips v. Railway Co.,* 64 Wis., 475. If the death of intestate had been caused by being jostled from the running-board, on which his feet were resting, or by being thrown from his position by the ordinary movement of the train, then the proximate cause might have been, in a "juridical sense," the perilous position he had assumed; but this view is not presented by the evidence. The separation of the train—the parting of the cars—would not have occurred if the automatic coupler had been used. It was not furnished, and this failure constituted negligence continuing up to the time of the injury, and bars the defense of contributory negligence, unless the negligent conduct of the injured employee amounted to recklessness. This was a question for the jury; and they have resolved the question, upon the evidence, against the defendant.

The third group of exceptions embraces those resting upon the contention that the intestate was doing work without the scope of his employment and beyond the sphere of his assigned duties, and that the intestate became a volunteer as to that work—a bare licensee—and the defendant cannot be compelled to answer in damages for an injury which the intestate "brought on himself by undertaking to do that which he was not directed to do or required to do." This contention is rested upon the doctrine so well stated by *Mr. Justice Walker* in *Patterson v. Lumber Co.,* 145 N. C., 42, and, if applicable, is decisive of this appeal. The witness Fleming, the general manager of the defendant company, being offered as a witness for it, testified: "Blackburn was employed as engineer—was not to do any switching or firing. He was to have complete charge of the train crew. He had power to hire and discharge the trainmen. This was the power he had up to the time he was killed. When Lem Rich went to work, I told him I wanted him to learn all he could about the engine. I did not tell him I wanted him to run the engine or do any switching. I told him I wanted him to learn all he could. Will Hassell was employed as switchman at the time of Blackburn's death." Again this witness said: "I did not tell Blackburn to do any switching or not to do any

switching. Rich ran the engine that night, after Blackburn was killed." Here, by this evidence, we have a man to whom is given the entire charge of his train crew, with the power to hire and discharge any of his trainmen; yet it is contended he cannot fire his own engine—he cannot, when the switchman is not doing his work satisfactorily, do it himself, without going beyond the sphere of his assigned duties and becoming a volunteer—a bare licensee—doing his master's work, but with no master to serve, suspending thereby the relation of master and servant. If the intestate had, that night, discharged Hassell, the switchman, we think he could have performed his duties as switchman without absolving his master (the defendant) from liability for injuries caused by its breach of duty.

In *Rodman v. Mich. Central R. R. Co.,* 55 Mich., 57, *Cooley, C. J.,* says: "That contingencies may and do arise in which the conductor should take charge of the engine for the time, is undoubted. The necessity may sometimes be as urgent as it is plain, and lives may depend upon it. This might happen from injury to the engineer, or sudden illness, and when, to leave the train where the disability of the engineer occurs, would endanger some other train. But there might be other reasons for the engineer leaving his post, for which the company would not be at fault, and the conductor, with the train in his charge and under obligation to avoid other trains, must act in the emergency as the necessities of the case shall require. His highest and plainest duty, in some circumstances, will be to take possession of the engine and operate it  *  *  *  and he being the person responsible for the safety and management of the train, must be allowed a certain discretion in deciding upon emergencies, and the presumption must favor his action." To the same effect is *Seley v. Southern Pac. Ry. Co.,* 23 Pac., 751; *Terre Haute and I. R. Co. v. Fowler,* 154 Ind., 682; 48 L. R. A., 531; *Barry v. Hannibal and St. J. R. Co.,* 98 Mo., 62; 2 Bailey Per. Inj. Relating to Master and Servant, sec. 3524.

The intestate being in charge of the train, in full charge of the train, having ample power to discharge and hire his crew, it would seem clear that his authority extended to supervision of the work done by his crew, and, as we have said, if any one of his crew did his work unsatisfactorily or was incompetent, the intestate had authority to discharge him or temporarily to suspend him and assign him other work on the train, and, for the time, perform the work of this removed trainman, without, in legal contemplation, going beyond the scope of his employment. He would still be the servant of the defendant. He must be considered, under the evidence, as invested with a certain dis-

cretion in deciding upon the occasion which makes his interference necessary in the proper management of his train and the proper conduct of the master's business entrusted to him, "and the presumption must favor his action."

The defendant requested his Honor to charge the jury that if the intestate voluntarily assumed to act as switchman and, while so acting, was injured, the injuries were received by the intestate in doing work outside the sphere of his assigned duties, and hence the defendant would not be liable. None of the defendant's instructions, however, presented the view, predicated upon the evidence of defendant's general manager, that we have herein presented as the decisive view, to wit, that intestate was in full charge of the train crew, etc., and we do not think it constitutes reversible error for his Honor to have refused the defendant's prayers. We are of the opinion that there was no reversible error committed at the trial, and the judgment is affirmed.

No error.